NOTICE

Decision filed 07/02/21. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2021 IL App (5th) 200419-U

NO. 5-20-0419

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* A.P., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Union County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 17-JA-2 |
| | ) | |
| David P., | ) | Honorable |
| | ) | Amanda Byassee Gott, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Justices Cates and Vaughan concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The trial court's orders finding that David P. was an unfit parent and that it was in the minor's best interest for David P.'s parental rights to be terminated were not contrary to the manifest weight of the evidence. We affirm the orders.

¶ 2   David P. (Father) appeals from two trial court orders—the October 13, 2020, order finding that he was an unfit parent and the November 20, 2020, order finding that it was in the best interest of A.P. that Father's parental rights be terminated.[1] Father timely appealed these orders on November 24, 2020. Father also asks this court to consider a different standard of

_____

[1]This appeal is subject to the mandatory accelerated disposition rules of Illinois Supreme Court Rule 311 (eff. July 1, 2018). The timeline for disposition can be modified for good cause shown. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Father and Mother separately appealed. Father's appeals were docketed one month prior to Mother's appeals. This court has determined that contemporaneous filing of the four orders is preferred because of the factual family and adoptive situations at issue.

1

proof for a best-interest determination. For the reasons stated in this order, we affirm the trial court's orders.

¶ 3                                I. BACKGROUND

¶ 4     A.P., the subject of this case, was born on December 24, 2009. This case began when A.P.'s younger brother, M.P., was born in February 2017. A hotline phone call was made to the Department of Children and Family Services (DCFS) State Central Register on February 10, 2017, reporting that A.P.'s mother, Michelle T. (Mother), had tested positive for marijuana and methamphetamine at the time of M.P.'s birth. Mother had also tested positive for methamphetamine twice during this pregnancy. DCFS was informed that M.P. was experiencing drug withdrawal symptoms. As a result of the positive drug screens, DCFS took A.P., M.P., and their older brother D.P.[2] (then 17) into protective custody.

¶ 5     The State filed its petition for adjudication of wardship and its first amended petition for adjudication of wardship on February 14, 2017, alleging that A.P. was a neglected minor in that he was under 18 years of age and his environment was then injurious to his welfare. See 705 ILCS 405/2-3(1)(b) (West 2014). In support, the State alleged that Mother gave birth to M.P. on February 9, 2017, and that his urine and umbilical cord blood both tested positive for marijuana. Mother also tested positive for marijuana on February 4, 2017, and for methamphetamine on November 14, 2016, and January 9, 2017, during her pregnancy with M.P. Father had pending criminal charges for aggravated driving while under the influence (DUI) in Union County in 2014. The criminal charges indicated that Father was under the influence of both cocaine and marijuana. The DUI charge was elevated to a felony because it was the third time that Father had been charged with a DUI. Since the 2014 charge, Father had not participated in any substance

_____

[2]As the cases progressed, D.P. turned 18 years old. D.P. requested that DCFS intervention on his behalf be discontinued. DCFS closed D.P.'s case.

2

abuse treatment. In the petition for adjudication of wardship, A.P. was alleged to be at substantial risk of harm due to the substance abuse issues of both parents. DCFS noted that this family had a previous history of substance abuse issues. A.P. was born in December 2009 and at birth tested positive for cocaine and marijuana. A.P. was in foster care in that case until March 2012. In the current case, the State asked that A.P. be adjudged as a ward of the court, and that the court grant custody and guardianship to DCFS. On this same date, the trial court appointed a guardian *ad litem* (GAL) on behalf of the three minors.

¶ 6    On March 27, 2017, the trial court entered its temporary order granting custody of A.P. to DCFS. DCFS was directed to set up appropriate services for Father. The trial court ordered supervised visitation and admonished the parents that "they must cooperate with the Illinois Department of Children and Family Services. The parents must comply with the terms of the service plan and correct the conditions that require the minor to be in care or they risk termination of their parental rights."

¶ 7                              A. Shelter Care Hearing

¶ 8    Father was not present at an initial shelter care hearing, and so a supplemental shelter care hearing was held on March 2, 2017. The trial court took judicial notice of a 2010 case involving the same parents and A.P. Michelle Dirden, a child protection specialist, testified on behalf of DCFS. Dirden testified that she had been involved with A.P. and the parents beginning in December 2009 when A.P. was born with cocaine and marijuana in his system. During the DCFS involvement with A.P. and the family, Father was caught smuggling in someone else's urine for a drug test. A.P. was ultimately returned to his parental home in March 2012 after the family successfully completed substance abuse treatment.

3

¶ 9 On February 9, 2017, Dirden received a report that M.P. had been born and had tested positive for marijuana. After M.P.'s case was assigned to her, she went to the hospital to perform a safety assessment. From Mother's medical records, Dirden learned that Mother had tested positive for methamphetamine two times during M.P.'s pregnancy—in November 2016 and in January 2017. M.P.'s weight at birth was approximately four pounds. Dirden testified that she had concerns that Mother was unable to meet the needs of this "fragile infant." Dirden stated that Father was not at the hospital when she conducted this safety assessment.

¶ 10 Dirden testified that A.P. and D.P. were placed in a Marion home with their older sister, Yalissa P., who resided there with an adult male.[3] When M.P. was released from the hospital, M.P. was placed in this same home. D.P. asked Dirden if he could be moved back to his hometown so that he could complete high school. He was moved to a fictive kin placement and Dirden reported that he was doing well in school and had a job.

¶ 11 Dirden testified that she had met with Father one week before the March 2, 2017, shelter care hearing. During this meeting, he acknowledged that he was a habitual marijuana user. Father indicated that he was willing to engage in treatment. He informed Dirden that he had moved out of the house in which Mother lived and was currently living in a camping trailer. Dirden testified that Mother told her that she had been having relationship issues with Father for some time and that Father sometimes stayed elsewhere, but that he did not officially move out of the family house until the weekend following M.P.'s birth. Dirden had not had an opportunity to view either Mother's house or Father's camping trailer and so was unable to provide opinions about whether either residential setting was appropriate for the children. Dirden testified that the mothers of both Father and Mother lived in the house with Mother. Overall, Dirden testified that

---

[3]In later DCFS reports, this adult male is not referenced. Instead DCFS states that Yalissa P. was living with her paternal grandmother.

this case presented an immediate and urgent necessity for DCFS to have temporary custody of the children and to make an appropriate placement.

¶ 12    On cross-examination, Dirden acknowledged that both A.P. and M.P. were born with drugs in their systems due to Mother's drug usage. She explained, however, that she remained concerned about Father due to his history of polysubstance abuse. After two reported substance abuse treatments, Father still self-reported chronic marijuana usage.

¶ 13    On redirect examination, Dirden explained that the children were removed from the parents' care due to neglect caused by an injurious environment. The fact that M.P. tested positive for marijuana at birth was but one factor that comprised the injurious environment. An additional relevant factor was the family's past DCFS involvement. Dirden testified that it was notable that the past involvement also involved familial substance abuse.

¶ 14    Father testified at the shelter care hearing. He stated that he saw M.P. the previous day, but he was contesting paternity. He testified that he had been living in a camping trailer for two months on Union County property owned by his pastor. The pastor allowed Father to use his electricity. Father testified that he had not been living with Mother immediately prior to moving to the trailer. Prior to living in the trailer, Father testified that he had resided in various locations with a girlfriend, a cousin, and an employer.

¶ 15    Father stated that he was unaware that Mother had used methamphetamine. He also indicated that he had never been present when Mother had used marijuana.

¶ 16    Father testified that Mother was supposed to be moving out of the house that they had shared. Father suggested to the court that he would move back into that house, and that D.P. and A.P. could live with him.

¶ 17    On cross-examination by the GAL, Father testified that he had never used marijuana with Mother, had never been in her presence when Mother used marijuana, and had only hearsay information that she had and was still using marijuana. Father confirmed that he left the children in Mother's care for at least two months.

¶ 18    At the conclusion of the hearing, the trial court stated that because Father acknowledged that he still used marijuana, because he had a past substance abuse history, and because he was currently residing in a camping trailer, the court found probable cause based on immediate and urgent necessity. The court ordered a paternity test to determine if Father was M.P.'s biological father.[4] On March 27, 2017, the trial court entered a temporary custody order granting DCFS custody of A.P. The court also directed DCFS to offer appropriate services for the parents and conduct supervised visits with A.P. In conclusion, the court noted: "The parents are admonished that they must cooperate with the Illinois Department of Children and Family Services. The parents must comply with the terms of the service plan and correct the conditions that required the minor to be in care or they risk termination of their parental rights."

¶ 19            B. Second and Third Amended Petitions for Adjudication of Wardship

¶ 20    The State filed its second amended petition on July 27, 2017. The State alleged that A.P. was a neglected minor in that he was under 18 years of age and his environment was injurious to his welfare. The allegations of this petition mirror the statements made by the trial court in its March 27, 2017, temporary custody order.

¶ 21    The State filed its third amended petition on July 31, 2017. The allegations of neglect and injurious environment regarding A.P. were restated. The State alleged that M.P. was born with marijuana in his system; that Mother tested positive for marijuana shortly before birth; that

---

[4]In a court filing on May 10, 2017, the DNA lab results confirmed that Father was M.P.'s biological father.

6

Father had the pending 2014 Union County charge of aggravated DUI; and that the environment was injurious to A.P. because of the substance abuse issues. The State removed the allegations that Mother had tested positive for methamphetamine twice while pregnant with M.P.; that D.P. was at substantial risk of harm due to low parental supervision; that A.P. was born with marijuana and cocaine in his system; that Mother had untreated bipolar disorder; and that Father had not engaged in substance abuse treatment during the pendency of his aggravated DUI charge.

¶ 22                                    C. Adjudicatory Order

¶ 23    On August 3, 2017, the trial court concluded that A.P. was abused or neglected by being subjected to an environment that was injurious to his welfare. The court concluded that the allegations of the third amended petition had been proven by a preponderance of the evidence.

¶ 24                                    D. Integrated Assessment

¶ 25    The integrated assessment report was completed and approved on June 8, 2017, and was filed with the court on September 18, 2017.[5] Father was interviewed on March 23, 2017, at the courthouse because Father did not have his own house. Father's mother was 15 when she became pregnant. Father reported that both his parents used heroin and crack cocaine. When Father was eight months of age, his father became incarcerated. His father was rarely involved in his life. Beginning at the age of six, Father was raised by his maternal grandmother in Chicago. Father

_____

[5]The record on appeal in this case does not contain a copy of the integrated assessment report because DCFS did not file a copy of its assessment in this case—Union County file No. 17-JA-2—*In re A.P.* DCFS prepared one assessment report covering all three boys and listing all three trial court docket numbers. Instead of filing a copy of the report in each case, the State filed the integrated assessment report only in Union County file No. 17-JA-4—*In re M.P.* This appeal involving A.P. (5-20-0419) was filed contemporaneously with the appeal involving M.P., docketed as 5-20-0420. Although not part of the record on appeal in this case involving A.P., pursuant to the powers granted to the appellate court pursuant to Illinois Supreme Court Rule 366(a) (eff. Feb. 1, 1994), we entered a separate order in this case on June 18, 2021, ordering that the September 18, 2017, file-stamped integrated assessment report be added to the record in this appeal *sua sponte*.

reported that he was expelled from school in the fifth grade for fighting. At around that time, he became affiliated with a Chicago gang called the Spanish Cobras. He was first arrested at the age of nine for robbery, and he was eventually placed in juvenile detention. During his childhood, Father's parents were both arrested for a crime involving a drug-induced homicide. At some point during his childhood, he searched certain Chicago streets for his mother because she was then working as a prostitute. Currently, both of Father's parents live in the same area of southern Illinois where he lives. He reports that his relationship with both is strained.

¶ 26    Father's highest level of education was the eighth grade. Although he had made attempts, he was unsuccessful in obtaining his GED.

¶ 27    Father acknowledged having three children with Mother, but he was uncertain that M.P. was his child. He stated that "he was planning to move out of the home prior to [Mother] having the baby." Father also acknowledged that he and Mother argued, especially when they were younger. He explained that at times these arguments became physically aggressive. Further, Father acknowledged an arrest for battery that involved one of Mother's sons. He described the relationship aggression "as something they have both done to one another."

¶ 28    Father stated that he began using marijuana when he was 10 years of age, beer and hard alcohol at 14 or 15 years of age, and cocaine and PCP at the age of 17. Father reported that when he was 16 years old, he completed substance abuse treatment for marijuana and PCP. Father reported that after being arrested for a DUI in 2003, he had a substance abuse evaluation. In 2010, Father completed a substance abuse assessment and had outpatient counseling at Fellowship House in Anna. In 2015, after a 2014 DUI, Father completed a substance abuse assessment and 75 hours of education. Father informed the evaluators that his drug of choice was marijuana. He asked the evaluators if they could help him get a prescription for medical

8

marijuana. He stated that he did not believe that he needed any substance abuse treatment.

¶ 29    Overall, the evaluators concluded that Father used alcohol and drugs as a coping mechanism connected to his childhood trauma. They found that Father dwelled on these childhood events. He stated that he believed his adult and parenting shortcomings were connected to the childhood events he experienced.

¶ 30    The evaluators were not able to determine what mental health counseling Father may have had in the past. While he said that he was willing to participate in mental health therapy, he stated that he did not believe it would be beneficial.

¶ 31    The report contained a reference to A.P.'s schoolteacher indicating that, in February 2017, the teacher stated that she had made numerous phone calls and written letters to the parents about A.P.'s risk of being retained due to truancy and poor academic functioning. According to his teacher, A.P. commonly missed Fridays. When A.P. was in school, his teacher noted that he was frequently picked up by his Father, and A.P. was always picked up before school ended.

¶ 32    The evaluators concluded that Father needed to have a domestic violence perpetrator assessment, a substance abuse evaluation, trauma-informed psychotherapy, therapeutic parenting education, and parenting coaching.

¶ 33                       E. Dispositional Report and Order

¶ 34    In advance of the dispositional hearing, DCFS filed its lengthy dispositional report on August 22, 2017. A copy of the report was also filed on September 21, 2017.[6] The dispositional

---

[6]The record on appeal in this case does not contain a copy of the dispositional report because DCFS did not file a copy of its report in this case—Union County file No. 17-JA-2—*In re A.P.* DCFS prepared one report covering all three boys and listing all three trial court docket numbers. Instead of filing a copy of the report in each case, the State filed the dispositional report only in Union County file No. 17-JA-4—*In re M.P.* This appeal involving A.P. (5-20-0419) was filed contemporaneously with the appeal involving M.P., docketed as 5-20-0420. Although not part of the record on appeal in this case involving A.P., pursuant to the powers granted to the appellate court pursuant to Illinois Supreme Court Rule 366(a) (eff. Feb. 1, 1994), we entered a separate order in this case on June 18, 2021, ordering that

9

report only covered about one month—July 27, 2017, to August 22, 2017. The permanency goal set by DCFS was to return A.P. home within 12 months. Father was not participating in any services, but he had expressed his willingness to do so. DCFS recommended services involving the following areas: domestic violence, substance abuse, and parenting. DCFS also recommended trauma-informed psychotherapy. As of the date of the report, Father had not completed drug screening. Father was employed at Robinson's Produce in Cobden. Visitation had been scheduled and supervised by the caregivers, but DCFS had received information that Father had engaged in unsupervised and unapproved overnight visits. Therefore, DCFS decided to change the visitation to be scheduled and supervised by its staff. DCFS noted that Father was not open about the status of his relationship with Mother in that DCFS could not determine if they planned to remain together, which would require services to help the couple attain that goal.

¶ 35    Attached to the dispositional report were separate reports. One of the reports involved the risk factors that resulted in DCFS filing its neglect case regarding A.P. Father was found to have had a history of domestic violence. Mother informed DCFS that she was struck during a pregnancy, but she refused to provide the name of her assailant. DCFS also found that Father caused Mother to experience great anxiety, which interfered with her parenting abilities.

¶ 36    DCFS created the following action steps for Father with a target completion date of February 9, 2018:

    (1) agreement to participate in parenting services through Project 12-Ways;

    (2) demonstration of the parenting skills learned in the Project 12-Ways classes;

    (3) completion of parenting services through Project 12-Ways;

    (4) agreement to participate in an assessment/evaluation and counseling with an approved

---

the September 21, 2017, dispositional report be added to the record in this appeal *sua sponte*.

10

provider to address domestic violence issues;

(5) agreement to cooperate with any recommendations made following the domestic violence assessment;

(6) agreement to demonstrate progress on the issue of domestic violence;

(7) agreement to have no domestic violence episodes within the home and within the child's presence;

(8) agreement to complete a mental health assessment through an approved provider;

(9) agreement to cooperate with any recommendations following the mental health assessment;

(10) agreement to demonstrate progress in mental health counseling to address his needs;

(11) agreement to be evaluated in an integrated assessment;

(12) agreement to follow all recommendations made after the integrated assessment;

(13) agreement to be cooperative with DCFS;

(14) agreement to sign all necessary paperwork to allow DCFS to obtain release of information from his service providers; and

(15) agreement to inform DCFS of any changes in his residential address, telephone number, police involvement, employment, or household composition within 24 hours of the change(s).

Although DCFS indicated in its report that Father was recommended for substance abuse services after a drug abuse screening, DCFS did not include any specific drug-related actions steps in this initial status report.

¶ 37    Father was found in agreement and/or compliant with 8 of the 15 action steps—agreement to participate in parenting services through Project 12-Ways, agreement to participate

11

in a domestic violence assessment/evaluation, having no reported domestic violence episodes, agreement to complete a mental health assessment, completion of the integrated assessment, agreement to the recommendations following the integrated assessment, cooperation with DCFS, and cooperation with DCFS with respect to any changes in his personal information.

¶ 38   The trial court entered its dispositional order on October 20, 2017. The court found that Father was "unfit to care for, protect, train, educate, supervise or discipline the minor and placement with him was contrary to the health, safety and best interests of the minor." The court found that the service plan and permanency goal were appropriate. The court granted the State's petition and adjudicated A.P. as neglected, made him a ward of the court, and placed A.P. in the custody of DCFS. Father was allowed supervised visitation.

¶ 39   DCFS filed an updated report with the court on February 13, 2018. A.P. was then eight years old and was described as healthy, happy, and bonded with his caregivers. DCFS did not know whether Father was participating in recommended services, as he had not signed any releases. Visitation was set for twice per week—one visit was to be supervised by the caregiver and the second was to be supervised by the DCFS provider. Father participated in no DCFS-supervised visits apparently because the caseworker and case aides had been unable to reach him.

¶ 40                    F. Permanency and Status Reports and Orders

¶ 41   On March 5, 2018, DCFS filed its permanency report. By that date, A.P. had been in substitute care for 388 days. DCFS stated that A.P. was doing well and was attending school on a regular basis. In addition, A.P. was receiving counseling services. DCFS listed the family safety threats as a history of substance abuse and domestic violence. DCFS stated that Father had not been cooperative with the recommended services outlined in its service plan. More specifically,

12

Father had not complied with Project 12-Ways parenting services and domestic violence services. Father reported that he had completed a mental health assessment, but DCFS had no documentation of this assessment or if any services had been rendered. DCFS noted that Father's participation with supervised visitation was inconsistent.

¶ 42 DCFS found that the case fit the criteria for legal screening because there had been two unsatisfactory rated service plans since the case was opened in February 2017. The permanency goal remained to be to return A.P. home within 12 months. The recommended date for achievement of this permanency goal was September 2018. The alternate plan for A.P. was an adoptive placement.

¶ 43 On March 8, 2018, the trial court entered its permanency order finding that Father had not made reasonable efforts nor had he made substantial progress toward returning A.P. home. Furthermore, the court found that Father's compliance and progress with his service plan was unsatisfactory. The court's order explained that for Father to receive a "making reasonable efforts and progress" rating, he needed to remain in contact with DCFS, engage in all recommended services, and provide verification of completed services to the caseworker or sign all necessary consents to release this information. The court found that the services listed in the DCFS service plan were appropriate and reasonably calculated to facilitate the achievement of the permanency goal because the services were designed to address the reasons why A.P. was placed in care. The court ordered that A.P.'s custody and guardianship should continue with DCFS and kept the dispositional order in effect.

¶ 44 On June 8, 2018, the State filed another permanency hearing report in this case. Father's progress on his service plan was rated unsatisfactory. Communication remained a significant issue. Father had not signed all required releases and thus DCFS continued to lack information

about what services he may have completed or was in progress of completion. DCFS attempted to set up a meeting during which Father could sign all consent forms, but that attempt was unsuccessful. DCFS had no documentation that Father had completed any domestic violence services, but he asked DCFS to switch the designation and nature of this action step from domestic violence to anger management. DCFS declined Father's request "due to the extensive history of domestic violence." Project 12-Ways parenting services had not begun. DCFS credited Father with completion of his mental health assessment but had no information about whether he had received services after, and based on, the assessment. DCFS scheduled several random drug tests that Father missed, and DCFS construed those tests as presumptive positives. Visitation with A.P. was still supervised and remained inconsistent due to Father's communication and transportation issues.

¶ 45　DCFS again found that the case fit the criteria for legal screening and that the concurrent plan for A.P. continued to be to return home within 12 months or alternatively an adoptive placement. The recommended date for achievement of this permanency goal was December 2018.

¶ 46　On June 12, 2018, DCFS filed a status report indicating that the agency had met with Father. Father reported that he was receiving mental health services, although DCFS continued to have no ability to verify this statement. DCFS reported that Father did not have a working phone. Father's random drug tests on June 1, 2018, and June 8, 2018, were both negative. Father promised to contact DCFS when he had a working phone, after which DCFS would make a housing advocate referral for assistance with employment and housing.

¶ 47　On July 9, 2018, DCFS filed an additional status report with the court. Father had missed scheduled drug tests on June 22, 2018, and July 6, 2018. The caseworker indicated that she had

received a call from Father's "service provider," who was dismissing Father for noncompliance with the attendance policy. Based upon the June 12, 2018, status report, we presume that the "service provider" was a mental health service provider, as Father had not been receiving any other services. DCFS indicated that it would refer this case for legal screening due to Father's noncompliance.

¶ 48    The trial court entered a permanency order on July 12, 2018, stating that the permanency goal remained to return A.P. home in 12 months. However, the court found that Father had not made reasonable and substantial progress toward the permanency goal. The court found that Father had not begun parenting services or domestic violence services, and while he had begun mental health services, DCFS had not received documentation.

¶ 49    On November 19, 2018, DCFS filed a permanency hearing report with the court.[7] DCFS indicated that the lengthy history of substance abuse and domestic violence in the home continued to be safety threats to A.P. However, there had been no reported domestic violence episodes in the past six months. DCFS reported that Father was not making satisfactory progress or reasonable efforts on his service plan. As of the date of this report, Father was incarcerated. DCFS noted that prior to his incarceration Father had cooperated with DCFS by keeping the agency informed of his legal situation. However, he was rated as unsatisfactory on all action plans regarding mental health, parenting, and domestic violence services. DCFS noted that

---

[7]The record on appeal in this case does not contain a copy of the November 19, 2018, permanency report because DCFS did not file a copy of its report in this case—Union County file No. 17-JA-2—*In re A.P.* DCFS prepared one report covering A.P. and M.P. and listing both trial court docket numbers. Instead of filing a copy of the report in each case, the State filed the dispositional report only in Union County file No. 17-JA-4—*In re M.P.* This appeal involving A.P. (5-20-0419) was filed contemporaneously with the appeal involving M.P., docketed as 5-20-0420. Although not part of the record on appeal in this case involving A.P., pursuant to the powers granted to the appellate court pursuant to Illinois Supreme Court Rule 366(a) (eff. Feb. 1, 1994), we entered a separate order in this case on June 18, 2021, ordering that the November 19, 2018, permanency report be added to the record in this appeal *sua sponte*.

15

Father could be receiving mental health and/or domestic violence services in prison, but it had received no confirmation from the prison. Both A.P. and M.P. were in a new foster placement. DCFS did not explain why the foster placement was modified. DCFS stated that both boys were removed from the home of their relative—presumably, from the home of their older sister, Yalissa—and were now in a traditional foster setting. A.P. was doing well in his new school in Herrin and was receiving weekly counseling services.

¶ 50 DCFS again concluded that the case fit the criteria for legal screening and that the concurrent plan for A.P. continued to be to return home within 12 months or alternatively an adoptive placement. The recommended date for achievement of this permanency goal was May 2019.

¶ 51 The record does not contain a permanency order, but the court ordered no prison visitation. Instead, the court authorized visitation for Father at the courthouse on days of scheduled hearings in this case. The court scheduled a permanency hearing for January 31, 2019, that was later continued until late February.

¶ 52 DCFS filed another permanency hearing report on January 18, 2019. There were no new updates from the previous report. DCFS reported that Father had not made satisfactory progress or reasonable efforts toward the service plan permanency goal. The new recommended date for achievement of the permanency goal was May 2019.

¶ 53 On February 28, 2019, the trial court entered a permanency order. The court found that the permanency goal should remain to return A.P. home within 12 months. The court found that Father had not made reasonable efforts or substantial progress toward the permanency goal.

¶ 54 On April 11, 2019, DCFS filed its updated family service plan dated February 7, 2019. Father was incarcerated in Shawnee Correctional Center. Father had been rated satisfactory on 2

of the 15 action steps—agreement to be open and honest in his integrated assessment interview and agreement not to allow further domestic violence episodes to occur within the home and in the presence of A.P. Communication and signed consents continued to be inadequate to ascertain compliance.

¶ 55 DCFS filed a status report with the court on June 4, 2019, indicating that the case was sent for legal screening but did not pass and was being held for an additional 30 days for the screener to review additional case information. Father remained incarcerated at Shawnee Correctional Center.

¶ 56 DCFS filed another status report with the court on September 9, 2019, indicating that A.P. had recently been relocated from the traditional foster placement to a home of fictive kin because of increased behavioral outbursts. A.P. had been hospitalized two times since July 1, 2019, due to aggressive behaviors and threat of self-harm/suicide. A.P. had refused all visitation with Mother because he was afraid of her. Father remained incarcerated at Shawnee Correctional Center. DCFS had been unable to obtain any records or verification of Father's participation in services while incarcerated.

¶ 57 DCFS filed its next permanency report with the court on October 30, 2019. DCFS reported that Father had not made satisfactory progress or reasonable efforts toward the permanency goal. Father was still incarcerated but was scheduled to be released in January 2020 with mandatory supervised release conditions that required Father to engage in substance abuse counseling, outpatient mental health counseling, and check-ins with probation by phone twice per week. DCFS reported that A.P. was receiving mental health services and had stabilized with his new fictive kin placement.

¶ 58 DCFS reported that the case passed legal screening on July 23, 2019. Thus, the requested

17

permanency goal had changed from return home in 12 months to substitute care pending court determination on termination of parental rights. DCFS explained that the original permanency goal could not now be achieved because Father remained incarcerated and was not able to care for his children and there had been no documentation that Father was receiving services in prison that would mitigate the circumstances that brought A.P. into care. Furthermore, DCFS stated: "Returning these children to their parents who are still in contact with and maintain a relationship with one another would be detrimental to the health and well[-]being of the children." DCFS explained that termination of parental rights was in A.P.'s best interest because "[t]he parents have not corrected the conditions which brought the children into care *** [and] continue to engage in behaviors that are not congruent with minimum parenting standards *** [and] put the children at immediate risk of harm."

¶ 59    The trial court entered its permanency order on October 31, 2019. Even though the case had passed legal screening, the trial court maintained the permanency goal to return A.P. home within 12 months because of a new assertion. Father had alleged that his mother was a member of a Native American tribe, and thus verification of this genealogy was required to determine if A.P. was eligible to be a member of this tribe. If A.P. was eligible to be a member of the Native American tribe, the Indian Child Welfare Act (25 U.S.C. § 1901 *et seq.* (2018)) would apply and would require the court to apply federal standards for A.P.'s foster and adoptive placements.

¶ 60    DCFS filed its next permanency report with the trial court on February 13, 2020. Father had been released from prison, but was unemployed and homeless, although he reported that he was living with "his son." He agreed to undergo substance abuse and mental health assessments, but he had yet to have either assessment completed. Father had not had any visitation with A.P. since his release from prison in late January 2020 due to a lack of communication. DCFS noted

18

that Father had claimed that the Indian Child Welfare Act was applicable to this case because he was of Choctaw descent. However, documentation from the Mississippi Band of Choctaw Indians indicated that although A.P.'s paternal grandmother was 50% Choctaw, and that made her eligible to be a member of the Mississippi Band of Choctaw Indians, Father was not eligible for tribal membership. Thus, A.P. was also not eligible for tribal membership, and the Indian Child Welfare Act was inapplicable. DCFS requested a permanency goal of substitute care pending court determination of termination of parental rights.

¶ 61    DCFS filed its permanency report with the court on June 30, 2020. DCFS asked the trial court to order substitute care pending its determination on termination of parental rights. Father was rated as not making satisfactory progress or reasonable efforts toward the permanency goal.

¶ 62    As of June 30, 2020, Father informed DCFS that he was employed but had not provided DCFS with documentation. From his counseling session records, DCFS noted that he informed his counselor that he was doing "odd jobs" for income. He was then living with a cousin in Anna. He did not follow through with recommended services after having substance abuse and mental health assessments. The service plan that was in effect upon Father's release from prison included substance abuse assessment and services in addition to the action steps from earlier plans. While Father received a mental health assessment and had sporadic attendance at counseling sessions, overall, his progress was deemed unsatisfactory. Father missed several counseling appointments. Communication was an issue as phone numbers changed. Father also refused to attend scheduled drug tests, which were marked as presumptive positives, and he had not engaged in substance abuse services. Father had never begun parenting classes because he did not have his own house. DCFS was concerned because Father claimed that he was not living with Mother, and yet both reported that they lived across the street from a foster parent. Father at

19

times stated that he and Mother were going to attend marriage counseling, while at other times he stated that they were getting divorced.

¶ 63    A.P. was doing well with psychiatric and psychological services. He was excelling at school and with his foster parents. He told the DCFS caseworker that he "was done" with his parents. He explained that he was fearful of his mother because he had witnessed her violent acts against his father. A.P. reported that he was looking forward to being adopted, that his foster family loved him, and that he knew that he belonged with them. A.P.'s foster parents advocated for an end to parental visitation. A.P. reportedly suffered emotional ill effects before and after visitation because A.P. was afraid that he would have to return home to his biological parents.

¶ 64    Father continued to have supervised visitation, and during the Covid-19 pandemic, the visitation sessions were via videoconference. DCFS noted that Father spent much of his time speaking with the children about the legal process instead of focusing on the children with age-related conversations. DCFS stated that Father displayed a lack of empathy and parenting skills with inappropriate conversations, an inability to understand A.P.'s nonverbal cues, and a failure to provide a food or snack at mealtimes when the visitation sessions were in person. Overall, Father did not have the ability to understand that his behavior impacted the mental health and well-being of A.P.

¶ 65    On July 7, 2020, the trial court entered its permanency order finding that the appropriate permanency goal was substitute care pending the hearing on the State's motion to terminate Father's parental rights. The court noted the length of time that A.P. had been in foster care, that A.P. was entitled to permanency, that Father had been incarcerated from August 2018 until January 2020, that Father had failed to complete any services required, and that there was "no sign" that further services would result in progress.

20

¶ 66                         G. Termination of Parental Rights

¶ 67    The State filed its motion for termination of parental rights on October 30, 2019. The hearing on the State's motion was delayed for almost one year due to Father's incarceration and his invocation of the Indian Child Welfare Act. The hearing on the State's motion was held on October 13, 2020.

¶ 68    The State alleged that Father was unfit for the following reasons as outlined in the Illinois Adoption Act (750 ILCS 50/1(D) (West 2018)):

> (1) Failure to maintain a reasonable degree of interest, concern, or responsibility as to A.P.'s welfare (*id.* § 1(D)(b));
>
> (2) Failure to protect A.P. from conditions within his environment that were injurious to A.P.'s welfare (*id.* § 1(D)(g));
>
> (3) Commission of other neglect of A.P. or misconduct toward A.P. (*id.* § 1(D)(h)); and
>
> (4) Failure by a parent:
>
>> (a) To make reasonable efforts to correct the conditions that were the basis for removal of the child from the parent during any nine-month period following the adjudication of neglected or abused minor (*id.* § 1(D)(m)(i)); and/or
>>
>> (b) To make reasonable progress toward the return of the child to the parent during any nine-month period following the adjudication of neglected or abused minor (*id.* § 1(D)(m)(ii)).

In conclusion, the State asked the trial court to find that Father was an unfit parent.

¶ 69    In a separate document filed on October 30, 2019, the State specified the alleged nine-month periods upon which it relied in its motion to terminate parental rights. The State relied upon two nine-month periods: September 21, 2017, to June 21, 2018; and June 21, 2018, to

March 21, 2019.

¶ 70   The hearing was held on October 13, 2020. The first witness to testify was Amy Tango. Tango testified that she was currently employed by Caritas Family Solutions as a foster care case manager. She was previously employed by Lutheran Social Services and was assigned as the DCFS caseworker on A.P.'s case from February 2017 until February 2019. Tango testified that Father completed an integrated assessment at the beginning of services and that, based on the integrated assessment, he was required to undergo a mental health assessment, substance abuse assessment, domestic violence services, and parenting classes. Part of the substance abuse process was scheduled random drug tests. During the two years that Tango worked on this case, the parents failed to appear for the scheduled drug tests on more than five occasions. Throughout the two years Tango was assigned to the case, Father made no progress on any aspect of his service plan action steps. However, Tango testified that Father participated in visitation before he was incarcerated. While he was incarcerated, Tango testified that he had visits with the children at the courthouse on hearing dates. She described the courthouse visits as pleasant and bonding. Tango stated that, based on the two years she was assigned to this case, Father's lack of progress made him an unfit parent.

¶ 71   Mallory Bollinger was next called to testify. Bollinger was a foster care supervisor for DCFS. Bollinger's job was to guide and supervise the foster care caseworkers. However, she was not the supervisor for the four assigned caseworkers on this case. To prepare for her testimony, she reviewed the files. She testified that, in the last few months, Father had made some progress, but that she would not classify that progress as substantial. She testified that he received a mental health assessment but did not thereafter participate in services. Bollinger testified that she received a substance abuse assessment he completed at a facility called Fellowship House. Father

22

had begun to take parenting classes at a facility called Women's Center. Bollinger indicated that she received records from one of the two prisons in which Father was incarcerated, but he participated in no services at that prison. Of gravest concern to Bollinger was that DCFS contacted Father for 16 random drug screens, but he attended only 2: on June 1, 2018, and June 8, 2018. Bollinger testified that all clients are informed that if they do not show for a random drug test, their failure to show will be treated as a presumptive positive result. Overall, Bollinger testified that, in her opinion, based upon her review of the records, Father should be found to be an unfit parent.

¶ 72    Father testified at the hearing that he has five children. Three children are adults. He is also the father of A.P. and M.P. He testified that he currently lives in Anna and is employed as a trash collector for Spurlock's Trash Service. During M.P.'s pregnancy, Father did not believe that M.P. was his child, and so he separated from Mother while she was pregnant. He stated that he was currently in the process of purchasing a four-bedroom house. He also testified that he owns a vehicle but did not then have a driver's license. Father explained that he accepted a plea deal for a longer sentence on a 2011 charge for attempt to defraud a drug test urine sample so that he would not be sent to prison for the 2014 DUI, as then he "could get my driver's license and be able to provide for my family and put the courts behind me and move on as a man." Father testified that before he went to prison, he got married to Mother.

¶ 73    Father testified that, while in prison, he participated in a No Dads Left Behind program as well as anger management services. However, he did not complete either program because he got into a fight in the dining hall. No drug treatment was provided at that prison. Father testified that, after he was paroled in 2020, he went to Union County Counseling and had therapy. He stated that the preceding Friday, he was given a "successful completion." He acknowledged that at

23

times he had no phone, and that DCFS would not have been able to contact him. He testified that he "signed releases" but acknowledged that he never obtained copies of his own records to provide DCFS.

¶ 74 The GAL asked Father about M.P.'s pregnancy. Father testified that Mother was not aware that she was pregnant until she was almost six months along in the pregnancy. When he moved out of the house, he left A.P. and D.P. in the house with Mother. He testified that he was unaware that she was testing positive for methamphetamine during the pregnancy or that she used other drugs because he was not present. The GAL also asked Father about the 14 missed random drug tests. Father responded: "That's a lie."

¶ 75 At the conclusion of testimony, the court allowed the attorneys to make arguments. The State argued that Father was unfit in that he failed to maintain a reasonable degree of interest in A.P. While incarcerated, Father never sent a letter or a card or attempted to make written contact with A.P. Furthermore, the State argued that Father made little effort to correct the conditions that brought A.P. into care. He did not follow through with assessments or services. He claimed that he completed mental health counseling just days before the hearing on the State's motion to terminate, but he made no effort to get those records to DCFS or the court. Both Father and Mother referenced domestic violence in the integrated assessment, but both testified that there was no domestic violence in their relationship. Father's attorney argued that Father was drug-free the entire period of his incarceration and that if the primary problem was drug abuse, a large portion of the time when the children were in DCFS custody, he was drug-free. Father's attorney also argued that he was now employed, trying to buy a house, and working on getting his driver's license back.

¶ 76 The GAL stated that while he understood Father's argument, this was not the first time

24

that Father, Mother, and their children were involved with DCFS. He argued that the overriding issue was drug usage and that the case was not about whether Father and Mother loved their children. The GAL argued that it was unfair to keep A.P. on hold. He argued that the issue came down to credibility of the witnesses, stating that no one was able to dispute the testimony about missed random drug tests. He argued that random drug tests were missed "due to the sole fault of the parents and *** that *** shows that they have not maintained that reasonable degree [and] *** [t]hey have not attempted to correct the elements that resulted in the children being taken from their home."

¶ 77    The trial court found that Father had maintained a degree of interest toward A.P. Thus, the court concluded that the State failed to meet its burden to terminate Father's parental rights on that basis. The court acknowledged Father's testimony that some services had recently been completed or were in the process of being completed but noted that Father was incarcerated throughout the second nine-month period (June 21, 2018, to March 21, 2019) and provided no documentary evidence that he completed services while incarcerated. However, the court was most concerned with the first nine-month period the State alleged—September 21, 2017, to June 21, 2018. The court found that Father made no effort to complete any of the services during that period. On that basis, the trial court concluded that Father was an unfit parent.

¶ 78                                    H. Best Interest Hearing

¶ 79    On November 23, 2020, the trial court held a hearing on the best interest of the minor. Several witnesses testified during the hearing.

¶ 80    The first witness called by the State was Mallory Bollinger, the DCFS foster care supervisor. Bollinger testified that she met with A.P. on four occasions in October and November 2020. A.P. was 10 years old on the date of the best interest hearing. He was living

25

with a foster family in Illinois. The parents of his foster mother had been A.P.'s foster parents when DCFS placed him after his December 24, 2009, birth. A.P.'s former foster parents currently live in Iowa and want to adopt him. Although A.P. only lived with them for approximately one year after he was born, DCFS contacted this family during this case to see if they would be willing to foster A.P. in this new case. While they were interested, the family no longer lived in Illinois and suggested their daughter and her husband as A.P.'s local foster parents. Bollinger testified that if the adoption fell through for the Iowa couple, his local foster parents have said that they would adopt A.P. A.P.'s foster family had been meeting his mental health, educational, and shelter needs. A.P. was happy in his current Illinois placement, but he was looking forward to moving to Iowa to live with his future adoptive family. A.P. was aware that he would not be able to routinely see M.P., and said that he will miss his older brother, D.P., but informed Bollinger that he will not miss his two oldest siblings. A.P. told Bollinger that he was fearful of both of his biological parents. Bollinger testified that she believed that it would be in A.P.'s best interest for Father's parental rights to be terminated and to allow the Iowa family to adopt him.

¶ 81    Tony Geiselman, a DCFS mental health counselor, testified that he had been providing weekly counseling sessions to A.P. since August 2017. He testified that when he began counseling A.P., A.P. was sad and confused about the removal from his family. However, as time passed, A.P. became angry about his situation. Geiselman confirmed that A.P. suffered some psychiatric issues during the summer of 2019 and had to be moved from the foster placement he shared with M.P. and moved to his current foster home. Although A.P. is no longer placed with his little brother, M.P., Geiselman testified that A.P. is content knowing that his brother is safe. He stated that A.P. characterized his overall feelings with his current foster

26

family as "safe." A.P. views Father with reverence but is angry that Father was not able to complete the tasks necessary for him to return home. Geiselman characterized A.P.'s attitude as one of frustration with his parents but hope and excitement about his future life in Iowa. He testified that A.P. understands that he will no longer be geographically close to his biological parents or siblings. While A.P. would like to maintain contact with D.P. and hopes to be able to visit with M.P., Geiselman testified that A.P. is ready for permanency.

¶ 82 Father testified on his own behalf. Father has five children: Rafael Bermudez, Yalissa P., D.P., A.P., and M.P. Rafael is his stepson. He testified that DCFS never offered him mental health counseling. Father testified that since his release from prison in January 2020, he scheduled a mental health evaluation on his own and that on October 8, 2020, he was released from mental health counseling. Father also stated that he had a substance abuse evaluation and that he had begun substance abuse treatment. He was also taking parenting classes. Father testified he was employed full-time for a trash collection company, and he had worked there for seven months, earning $13,256 to the date of the hearing. He testified that he had opened a checking account. He had also rented a four-bedroom, two-bathroom house in Anna, which he was attempting to purchase. Father acknowledged that, in 2017, the familial situation was not good, but he argued that he had turned his life around and was ready to accept his responsibilities. Father testified that he is Italian and Choctaw Native American and Mother is Puerto Rican.

¶ 83 Since his January 2020 discharge from prison, Father had only seen A.P. twice. He testified that his caseworker was unhappy that he and Mother had resumed their relationship and that they had married. Mother was not complying with her service plan, and the caseworker explained to Father that even if he complied with his service plan, the home remained unsafe.

Father claimed that to put his children first, he separated from Mother. However, DCFS had not allowed him visitation rights. Father said that the two visits he had with A.P. went very well.

¶ 84    Next, Father's stepson, Rafael Bermudez, testified. He testified that Father had been the only father he had known since he was two years of age. He and Father were both employed in the same trash collection business. Bermudez testified that his life was "a hundred percent" better for having Father in his life.

¶ 85    At the conclusion of the hearing, the trial court allowed argument. The State argued that the issue was not about what Father desired or needed and was not about relitigating his fitness as a parent. The only factor to be considered was what was in A.P.'s best interest. The State reviewed the testimony and reminded the court that A.P. was in favor of the adoption plans. Further, if for some reason the interstate adoption was not possible, his current foster parents would adopt him. The State argued that it had met its burden of proving that termination of Father's parental rights was in A.P.'s best interest by the preponderance of the evidence. In support, the State cited to the testimony of A.P.'s mental health therapist and the DCFS supervisor, Bollinger. The attorney for Father argued that, as he had raised three adult children who were successful, termination of his parental rights to the youngest two would be improper. Further, the attorneys contended that Father's communication issues with DCFS occurred because DCFS caseworkers were difficult to reach. The GAL acknowledged that the parents were successful in their attempts to regain custody of A.P. after his birth. However, as they had not been successful in this case, A.P. deserved permanency and a lack of future disruption. The GAL asked the court to terminate Father's parental rights.

¶ 86    The court began its order by noting that Father loved A.P. The court stated that although Father had older adult children, there was little testimony demonstrating significant family ties

28

between these adult children and A.P. Instead, the trial court focused on A.P.'s lengthy foster placement during this case and on the fact that A.P. had been placed in DCFS guardianship and custody at birth. The court also expressed concern about the family and its attempts to thwart the rules. A.P. and M.P. were removed from their placement with their older sister, Yalissa, and their grandmother because Yalissa and the grandmother defied DCFS rules and allowed Father to have unsupervised, unscheduled, and overnight contact with A.P. without DCFS's approval or knowledge. The court also noted that once termination of Father's parental rights neared, Father finally began engaging in services. The trial court noted that the time for Father to have worked on DCFS service plans was early in the process. In finding that it was in A.P.'s best interest to grant the State's motion for termination of parental rights, the trial court stated:

> "I have parties who have not participated, do not have significant relationships at this point with their children. I have testimony of a counselor that [A.P.] believes he is safe and just wants [M.P.] to be safe, but in no discussion about safety does it involve being with the parents."

¶ 87    On November 24, 2020, the trial court entered its permanency order. The court changed A.P.'s permanency goal to adoption.

¶ 88                                    II. ANALYSIS

¶ 89    Father appeals, asking this court to reverse the trial court's orders finding that he was an unfit parent and that termination of his parental rights was in A.P.'s best interest.

¶ 90    Section 2-29 of the Juvenile Court Act of 1987 provides the procedural basis for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2018). The procedure involves two steps. With step one the State must prove, by clear and convincing evidence, that the parent is unfit as defined by the Adoption Act. *Id.*; 750 ILCS 50/1(D) (West 2018); *In re A.J.*, 269 Ill. App. 3d 824, 828 (1994). If the trial court finds that the parent is unfit, the process moves to step two. With step two, the State must prove, by a preponderance of the evidence, that it is in

29

the child's best interest that the parent's rights be terminated. 705 ILCS 405/2-29(2); *In re J.L.*, 236 Ill. 2d 329, 337-38 (2010).

¶ 91 On appeal from a trial court's findings that a parent is unfit and that terminating the parental rights is in the child's best interest, the reviewing court must not retry the case but, instead, must review the trial court's findings to determine if the findings are against the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d 92, 104 (2008). A decision is contrary to the manifest weight of the evidence if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented. *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28 (citing *In re Joseph M.*, 398 Ill. App. 3d 1086, 1089 (2010)); *In re S.R.*, 326 Ill. App. 3d 356, 360-61 (2001).

¶ 92 We first review the evidence to determine if the State met its burden of proving, by clear and convincing evidence, that Father met any of the alleged definitions of an "unfit person" contained in the State's motion for termination of parental rights. The trial court found that the State did not meet its burden of proof on the issue of whether Father failed to maintain a reasonable degree of interest, concern, or responsibility as to A.P.'s welfare. The trial court did not comment upon the bases alleged by the State—that Father failed to protect A.P. from injurious conditions within his environment and that he committed other neglect of A.P. and/or misconduct toward A.P. However, the trial court determined that the State met its burden of proof that Father had failed to make reasonable efforts and failed to make reasonable progress during the first nine-month period relied upon by the State: September 21, 2017, to June 21, 2018.

¶ 93 "Reasonable effort" is determined by a subjective standard that refers to the amount of effort which is reasonable for that parent. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1066-67

30

(2006). The court must determine whether the parent has made committed and diligent efforts toward correcting the conditions that led to the removal of the minor from the home. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24.

¶ 94 "Reasonable progress" is determined by an objective standard, based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17 (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1067). "The benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *Id.* (citing *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001)). A parent makes reasonable progress when the trial court can find that the progress "is sufficiently demonstrable and of such a quality" that the trial court may soon be able to order the return of the minor to the parent's custody. *Id.* (citing *In re J.H.*, 2014 IL App (3d) 140185, ¶ 22).

¶ 95 We review the evidence in this case to determine whether the trial court correctly concluded that Father did not make reasonable efforts to correct the conditions that resulted in A.P.'s removal from the home. Here, the conditions that were the basis for A.P.'s removal from the home stemmed from his younger brother's birth. A.P.'s brother, M.P., was born with marijuana in his system. At the time of M.P.'s birth, Father was allegedly separated from Mother because he did not believe that he was M.P.'s biological father. However, there was conflicting testimony about when Father moved out of the house. Father claims that he moved out of the house two months before M.P.'s birth. Both Mother and daughter, Yalissa, informed Michelle Dirden, the DCFS caseworker assigned to the case, that Father moved out of the house after M.P.

31

was born. Father admitted to Dirden that he was a habitual marijuana user. Father testified at the shelter care hearing that he had hearsay information that Mother had been using marijuana in the past and in the present. Furthermore, from the earlier DCFS file opened after A.P.'s birth, when it was found that A.P. was born with cocaine and marijuana in his system, the court learned that Father had been through substance abuse rehabilitation twice. Additionally, he had a history of DUI and assault arrests. The integrated assessment performed by DCFS indicated that domestic violence, substance abuse, and mental health were all of concern with Father, and DCFS created a service plan around these concerns.

¶ 96　We next turn to the relevant nine-month period—September 21, 2017, to June 21, 2018. Just before that nine-month period began, DCFS filed its dispositional report which outlined the 15 action steps assigned to Father's service plan. Before September 21, 2017, Father was found compliant with 8 of the 15 action steps. He had completed the integrated assessment, had complied with DCFS, and had agreed to service recommendations. By February 13, 2018, when DCFS filed a status report with the trial court, the situation had changed. Father was then noncompliant with almost all the action steps. DCFS had no verification that Father had participated in or completed any services. Although Father had been provided with two supervised visits each week—one with the caregiver and the other with a DCFS provider—there was no documentation of the DCFS provider visits. Moreover, caseworkers and aides were unable to reach Father.

¶ 97　DCFS filed a permanency report on March 5, 2018, that reflected an unsatisfactory rating on Father's service plan. Father had not complied with parenting and domestic violence services. Father stated that he had completed a mental health assessment, but as of the report date, no records of verification had been received.

¶ 98    DCFS filed another permanency report on June 8, 2018, that also reflected an unsatisfactory rating on Father's service plan. DCFS was struggling to communicate with Father. Father asked DCFS to switch the domestic violence plan to an anger management plan, but DCFS refused because of the family history of domestic violence. Father had completed a mental health assessment, but DCFS had no documentation or verification that Father had continued with the recommended services. Parenting classes had not begun. DCFS had been contacting Father to come in for random drug tests. Father did not show up for several of those test appointments. DCFS policy was that if a parent failed to appear for a scheduled drug test, the missed test was construed as presumptively positive. Father tested negative on June 1, 2018, and on June 8, 2018. DCFS filed a status report on June 12, 2018, indicating that Father did not then have a working phone.

¶ 99    Considering Father's efforts on a subjective basis, we find that the trial court correctly concluded that Father did not show reasonable efforts to address the problems that led to A.P.'s removal from the home. The primary issues in this case were substance abuse and domestic violence. While Father had been able to have A.P. returned home in the first DCFS case after much substance abuse care, he made virtually no effort this time. He received a mental health assessment and took two random drug tests. Visitation was somewhat sporadic. Father did not engage in substance abuse-related services and missed many scheduled random drug tests. He did not yet have a house and so parenting classes had not started. Furthermore, Father did not believe that he needed a domestic violence assessment and services. DCFS offered all required services, and Father failed to communicate and failed to work the service plan.

¶ 100  We next review the evidence in this case to determine if the trial court correctly concluded that Father also failed to make reasonable progress to correct the conditions that

33

resulted in A.P.'s removal from the home. Looking at this from an objective consideration, Father did not make reasonable progress. The court repeatedly warned the parents about the need to comply with the service plans. We acknowledge that Father had two negative random drug tests at the end of the nine-month period and that he completed his mental health examination. However, he did nothing else toward the completion of his service plan. As stated earlier, the benchmark for reasonable progress is compliance with the service plan and the court's directives. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17 (citing *In re C.N.*, 196 Ill. 2d at 216-17). Moreover, missing scheduled random drug tests was devastating to an objective review of Father's progress when substance abuse was at the foundation of DCFS's decision to remove A.P. from the home.

¶ 101   We find that the trial court fully considered the evidence in the record and at the fitness hearing. We conclude that the trial court's finding that Father was an "unfit person" was not contrary to the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d at 104.

¶ 102   Once a trial court finds a parent to be an "unfit person," the court must then consider the child's best interest. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The trial court must consider several factors within "the context of the child's age and developmental needs" when considering if termination of parental rights serves a child's best interest. 705 ILCS 405/1-3(4.05) (West 2018). These factors include:

> "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;
>
> (b) the development of the child's identity;
>
> (c) the child's background and ties, including familial, cultural, and religious;
>
> (d) the child's sense of attachments, including:

(i)      where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii)     the child's sense of security;

(iii)    the child's sense of familiarity;

(iv)    continuity of affection for the child;

(v)     the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." *Id.*

Here, the trial court did not specifically identify which factors it considered in its verbal or written orders. However, the trial court's ultimate determination and order does not need to reference and discuss each factor. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 103   On appeal from an order terminating a parent's rights, the reviewing court gives great deference to the trial court's decision because the trial court is in a much better position to see the witnesses and judge their credibility. *In re K.B.*, 314 Ill. App. 3d 739, 748 (2000). A court's finding that termination of parental rights is in a child's best interest will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009). A best-interest determination is against the manifest weight of the evidence

only if the facts clearly demonstrate that the court should have reached the opposite result. *In re Daphnie E.*, 368 Ill. App. 3d at 1072.

¶ 104   In this case, the record clearly reflects that termination of Father's parental rights was the appropriate outcome for A.P. In A.P.'s short life, he had twice been removed from the home of his parents. On the date of the court's termination order, A.P. had been in foster care for three years and nine months. The testimony and other evidence indicated that A.P. had thrived in his most recent placement and that his physical and mental health needs were more than amply being met. A.P. also renewed his relationship with the foster care providers he had as an infant. This family wishes to adopt A.P., and A.P. is willing and excited about this move, the adoption, and permanency. A.P. has a backup adoption offer from the Iowa couple's daughter, who is A.P.'s current foster mother. Although A.P. will not likely see his younger brother M.P. as often as he does now after he moves to Iowa, the Iowa family and M.P.'s foster mother have agreed to continue contact. As this case nears the fourth year of substitute care, the trial court's conclusion that A.P. deserved the permanency and security he craved is appropriate. We find that the trial court's order is not contrary to the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d at 104.

¶ 105   Finally, Father also asks this court to adopt a judicial discretion standard suggested by Justice Garman in her dissent in the Illinois Supreme Court's 2004 opinion, *In re D.T.*, 212 Ill. 2d 347, 371 (2004). To date, the Illinois Supreme Court has not adopted Justice Garman's suggested judicial discretion standard in best-interest determinations. We decline Father's request, as this court is bound by decisions of our supreme court. *Du Page County Airport Authority v. Department of Revenue*, 358 Ill. App. 3d 476, 486 (2005).

¶ 106                                   III. CONCLUSION

¶ 107   For the foregoing reasons, we affirm the judgments of the Union County circuit court

finding that Father was an unfit parent and that his parental rights should be terminated.

¶ 108   Affirmed.